**DIFRANCO ET AL., APPELLEES, *v.* FIRSTENERGY CORPORATION ET AL., APPELLANTS.**

[Cite as *DiFranco v. FirstEnergy Corp.,* **134 Ohio St.3d 144, 2012-Ohio-5445.**]

*Public Utilities Commission—Exclusive jurisdiction over rate-related matters—*
*Common pleas court lacks jurisdiction over claim of fraud in terminating*
*discount for all-electric residential customers.*

(No. 2011-2025—Submitted September 26, 2012—Decided November 28, 2012.)

APPEAL from the Court of Appeals for Geauga County,

No. 2010-G-2990, 2011-Ohio-5434.

_____

**MCGEE BROWN, J.**

### SUMMARY

{¶ 1} The Cleveland Electric Illuminating Company ("CEI") and Ohio Edison Company, appellants, are public utilities under R.C. 4905.02 that supply electricity throughout northeast Ohio, including Geauga County. CEI and Ohio Edison (collectively, the "companies") are wholly owned subsidiaries of appellant FirstEnergy Corporation, which is not a public utility. The appellees are residential customers of CEI and Ohio Edison.

{¶ 2} The customers filed a class-action complaint against FirstEnergy and the companies in the Geauga County Court of Common Pleas.[1] The complaint raised four causes of action: (1) declaratory judgment, (2) breach of contract, (3) fraud, and (4) injunctive relief. The customers alleged that the companies promised to charge them a discounted rate for electricity if they purchased all-electric homes or equipped their homes with electrical heating systems and

_____

1. The customers also requested class-action status. That issue is not before the court.

appliances. The customers further alleged that the companies guaranteed the discounted rate for as long as the customers maintained their all-electric status. The customers contend that the companies unilaterally terminated the discount rates in May 2009 and that they now pay a higher rate for electricity.

{¶ 3} The sole issue before this court is whether the customers properly filed their fraud claim in the common pleas court or whether that claim should have been filed with the Public Utilities Commission of Ohio (the "commission" or "PUCO"). For the reasons that follow, we find that the commission has exclusive jurisdiction over the allegations of fraud set forth in the complaint.

## BACKGROUND

{¶ 4} In 1974, the companies implemented commission-approved special discount rates for certain of their customers. Residential customers who used electricity as their main source of energy were charged rates lower than those paid by the companies' standard-service residential customers. The companies' all-electric rate schedules used a "declining block rate structure," a rate design that encouraged customers to use more electricity because the customer's rate declined with greater energy usage. *See In re Application of Ohio Edison et al. for Approval of a New Rider & Revision of an Existing Rider*, Pub. Util. Comm. No. 10-176-EL-ATA, at 2 (May 25, 2011).

{¶ 5} In 2006, the commission approved FirstEnergy's rate-certainty plan. The approved plan included a provision that certain all-electric rate discounts would no longer be available to new customers or new premises beginning in January 2007. Existing all-electric customers were, however, allowed to continue to receive discounted rates. The commission stated that the purpose of discontinuing the all-electric rate schedules for new customers and premises was to promote energy conservation by eliminating rate discounts to customers who use large amounts of electricity. *In re FirstEnergy*, Pub. Util. Comm. No. 05-1125-EL-ATA, Rehearing Entry, at 7–9 (Mar. 1, 2006).

{¶ 6} In January 2009, the commission issued an order in FirstEnergy's most recent distribution rate case. *In re FirstEnergy*, Pub. Util. Comm. No. 07-551-EL-AIR (Jan. 21, 2009). At that time, CEI had 12 residential distribution rate schedules and Ohio Edison had 7. The commission approved the consolidation of these different rate schedules into one residential distribution rate for each company. *Id*. at 23-24. The consolidation, however, harmed some all-electric customers because it removed the substantial discounts they were receiving on their winter heating rates. To mitigate the rate increase, the commission approved a rate credit (Rider RDC) for these customers. *Id.*

{¶ 7} In March 2009, the commission issued its second order in FirstEnergy's first electric-security-plan case. *In re FirstEnergy*, Pub. Util. Comm. No. 08-935-EL-SSO (Mar. 25, 2009). In order to create a generation rate structure similar to the consolidated distribution rate structure approved in January, the commission consolidated the companies' various residential generation rate schedules into a single generation rate schedule for each company. Like the consolidation of the distribution rate schedules, this consolidation increased the rate for a number of customers receiving discounted service under the all-electric residential rate schedules. The commission therefore approved another residential rate credit (Rider EDR) to mitigate the effect. *Id*. at 9-10; No. 10-176-EL-ATA, at 3.

{¶ 8} In addition, in FirstEnergy's second electric-security-plan case, the commission ordered that Rider EDR be extended until May 31, 2014. *In re FirstEnergy*, Pub. Util. Comm. No. 10-388-EL-SSO (Aug. 25, 2010); No. 10-176-EL-ATA, at 3. In sum, the distribution and generation credit riders amounted to a total rate discount of approximately 3.6 cents per kilowatt hour. *Id.* at 4.

{¶ 9} Despite these discounts, there was substantial public concern during the 2009-2010 winter heating season regarding the bills of all-electric residential customers. In order to provide rate relief to residential customers who were

harmed by the rate-schedule consolidations, FirstEnergy filed an application with the commission on February 12, 2010, to revise its current tariffs. *Id.*

{¶ 10} Four days later, on February 16, 2010, the customers filed the underlying complaint against FirstEnergy and the companies in the common pleas court. The customers alleged that the companies had offered to charge them a discounted rate for electricity if they purchased all-electric homes or equipped their homes with electrical heating systems and appliances. According to the customers, the companies guaranteed that the discounted rate would not end as long as they maintained their all-electric status, even if the companies removed the rate from their tariff schedules on file at the PUCO. The customers maintained that they relied on the promised discount and purchased all-electric homes or electrical heating systems and appliances instead of those powered by natural gas or other sources of energy. The customers contend that despite the guaranteed discount, the companies eliminated the discount rate in May 2009, and the customers are now paying a higher rate (four cents or more per kilowatt hour) for electricity.

{¶ 11} The complaint raised four causes of action: (1) declaratory judgment, based on an alleged contractual obligation by the companies to permanently provide the discounted rates, (2) breach of contract, based on the companies' termination of the discounted rates, (3) fraud, for inducing customers to purchase all-electric homes, electrical heating systems, and appliances by falsely representing that reduced rates would be permanent, and (4) injunctive relief, based on the contract and fraud claims, to enjoin the companies from charging customers more than the discounted rate.

{¶ 12} On March 3, 2010, the commission issued an order in No. 10-176-EL-ATA approving FirstEnergy's application with modifications. As it relates to this appeal, the order provided interim rate relief for the companies' all-electric customers until the commission could determine the best long-term solution to the

electricity rate increase brought about by the commission's orders in FirstEnergy's distribution and electric-security-plan cases. Specifically, the commission ordered FirstEnergy to file tariffs for all-electric residential customers that would return their electric rates to December 31, 2008 levels. *Id.* at 3. FirstEnergy filed Rider RGC—which provides another rate credit to electric-heating customers in addition to Riders RDC and EDR—to comply with the commission's directive.

{¶ 13} On March 18, 2010, FirstEnergy filed a motion to dismiss the customers' complaint in the common pleas court under Civ.R. 12(B)(1). The motion asserted that the common pleas court lacked subject-matter jurisdiction over the claims. On September 7, 2010, the trial court granted the motion, finding that the PUCO has exclusive jurisdiction over the allegations in the complaint.

{¶ 14} The customers appealed the trial court's order on September 29, 2010. While the case was pending before the court of appeals, the commission issued a decision in No. 10-176-EL-ATA that addressed the appropriate long-term rates to be charged to all-electric residential customers of FirstEnergy. The commission ordered that Rider RGC—which provided a credit for electric-heating customers to return their rates to 2008 levels—would be frozen for two years and then phased out over the following six years. The commission also ordered that the rate credits being provided to FirstEnergy's electric-heating customers through Riders RDC and EDR would remain unchanged. *See* Pub. Util. Comm. No. 10-176-EL-ATA, at 8, 20 (May 25, 2011).

{¶ 15} On October 21, 2011, the court of appeals affirmed the dismissal of the customers' claims for declaratory judgment, breach of contract, and injunctive relief. The court of appeals found that each of these claims stemmed from the companies' alleged breach of promise to charge a discounted rate and that challenges to rates and rate-related matters are within the exclusive purview of the PUCO. 2011-Ohio-5434, 969 N.E.2d 1241, ¶ 54-56.

**{¶ 16}** The appellate court, however, reversed the trial court's decision that the PUCO had jurisdiction over the customers' fraud claim. The court of appeals first determined that the trial court had jurisdiction because fraud is a civil action that existed at common law in Ohio. *Id.* at ¶ 55, citing *Milligan v. Ohio Bell Tel. Co.*, 56 Ohio St.2d 191, 195, 383 N.E.2d 575 (1978). The court also determined that the PUCO's expertise was not necessary to resolve the fraud claim and that the act complained of was not a practice normally authorized by the utility. *Id.* at ¶ 58-59, citing *Allstate Ins. Co. v. Cleveland Elec. Illum. Co.*, 119 Ohio St.3d 301, 2008-Ohio-3917, 893 N.E.2d 824. Having determined on two separate grounds that the trial court had jurisdiction over the fraud claim, the court of appeals remanded that claim to the trial court for further proceedings. *Id.* at ¶ 82.

**{¶ 17}** FirstEnergy appealed to this court. We accepted discretionary jurisdiction over the appeal.

## DISCUSSION

### Subject-matter jurisdiction

**{¶ 18}** The sole question for our consideration is whether the court of appeals erred in holding that the trial court—instead of the PUCO—has jurisdiction over the customers' fraud claim. For the reasons that follow, we reverse the judgment of the court of appeals and reinstate the judgment of the common pleas court.

**{¶ 19}** The General Assembly enacted R.C. Title 49 to regulate the business activities of public utilities, including the regulation of utility service and the fixing of rates. *Kazmaier Supermarkets, Inc. v. Toledo Edison Co.*, 61 Ohio St.3d 147, 573 N.E.2d 655 (1991). R.C. 4905.26 confers exclusive jurisdiction on the PUCO to adjudicate complaints filed against public utilities challenging any rate or charge as "unjust, unreasonable, * * * or in violation of law." *See also State ex rel. Columbia Gas of Ohio, Inc. v. Henson*, 102 Ohio St.3d 349, 2004-

6

Ohio-3208, 810 N.E.2d 953, ¶ 16; *State ex rel. Illum. Co. v. Cuyahoga Cty. Court of Common Pleas*, 97 Ohio St.3d 69, 2002-Ohio-5312, 776 N.E.2d 92, ¶ 18.

{¶ 20} The court of common pleas, however, retains limited subject-matter jurisdiction over pure tort and contract actions involving utilities regulated by the commission. *State ex rel. Ohio Edison Co. v. Shaker*, 68 Ohio St.3d 209, 211, 625 N.E.2d 608 (1994). *See Kazmaier*, 61 Ohio St.3d at 154, 573 N.E.2d 655 ("pure common-law tort claims may be brought against utilities in the common pleas court"); *Milligan v. Ohio Bell Tel. Co.*, 56 Ohio St.2d 191, 195, 383 N.E.2d 575 (1978) (claim that telephone company invaded customer's privacy was actionable in common pleas court); *State ex rel. Illum. Co.*, 97 Ohio St.3d 69, 2002-Ohio-5312, 776 N.E.2d 92, ¶ 32 (the commission has no jurisdiction over pure contract claims that do not require consideration of R.C. Title 49 or commission regulations). The PUCO is not a court and has no power to ascertain and determine legal rights and liabilities. *State ex rel. Dayton Power & Light Co. v. Riley*, 53 Ohio St.2d 168, 170, 373 N.E.2d 385 (1978); *New Bremen v. Pub. Util. Comm.*, 103 Ohio St. 23, 30-31, 132 N.E. 162 (1921).

{¶ 21} The question, therefore, is whether the customers' fraud claim relates to utility rates or service, or whether it is a pure tort action.

**The court of appeals' reliance on *Milligan* was misplaced**

{¶ 22} We first address the court of appeals' reliance on *Milligan v. Ohio Bell Tel. Co.*, 56 Ohio St.2d 191, 383 N.E.2d 575. The court of appeals first held that, pursuant to *Milligan*, the court of common pleas has subject-matter jurisdiction to adjudicate the fraud claim "because fraud is a civil action that existed at common law in Ohio." 2011-Ohio-5434, 969 N.E.2d 1241, at ¶ 55.

{¶ 23} This court held in *Milligan* that a court of common pleas lacks jurisdiction to hear a complaint regarding a utility's rates and services. *Milligan*, paragraph two of the syllabus. The *Milligan* court also held that a common pleas court has jurisdiction pursuant to R.C. 2305.01 to hear a properly stated invasion-

of-privacy claim against a public utility. *Milligan*, paragraph three of the syllabus. Thus, *Milligan* recognized that "pure common-law tort claims may be brought against utilities in the common pleas court." *Kazmaier*, 61 Ohio St.3d at 154, 573 N.E.2d 655. This court did not hold in *Milligan*, contrary to the court of appeals' assertion, that the common pleas court has jurisdiction over an action against a utility so long as the action existed at common law.

**{¶ 24}** The court of appeals relied on the following language from *Milligan*, 56 Ohio St.2d at 195, 38 N.E.2d 575, to support its holding: "Whereas the right of privacy has been recognized as a legal right existing at common law in this state, * * * it follows that the Court of Common Pleas has subject-matter jurisdiction pursuant to R.C. 2305.01 to hear a complaint alleging a violation of this right by a utility." 2011-Ohio-5434, 969 N.E.2d 1241, at ¶ 28.

**{¶ 25}** Despite this language, the dispute over jurisdiction in *Milligan* did not turn on the status of the claim as a common-law tort. Rather, jurisdiction over the privacy claim turned on the fact that nothing in the record indicated that the trial court lacked subject-matter jurisdiction. This court was "not convinced" that the trial court properly dismissed the privacy claim for lack of jurisdiction because the plaintiff in *Milligan* had set forth no operative facts regarding his privacy claim. *Id.* at 195-196. Ohio Bell had likewise provided no evidence to support its Civ.R. 12(B)(6) motion to dismiss for lack of jurisdiction. In short, the record was silent as to whether the privacy claim involved utility rates or services or whether it was a pure common-law tort. This court, therefore, had no basis to uphold the trial court's dismissal for lack of subject-matter jurisdiction. *Id.*

**{¶ 26}** Furthermore, the court of appeals' interpretation of *Milligan* finds no support in our more recent decisions. We have held in cases involving public utilities that merely casting the allegations in the complaint to sound in tort "is insufficient to confer jurisdiction upon the common pleas court." *State ex rel. Columbia Gas of Ohio, Inc. v. Henson*, 102 Ohio St.3d 349, 2004-Ohio-3208, 810

N.E.2d 953, ¶ 19. *See also Hull v. Columbia Gas of Ohio*, 110 Ohio St.3d 96, 2006-Ohio-3666, 850 N.E.2d 1190, ¶ 34 (casting allegations to sound in tort or contract is insufficient to confer jurisdiction on trial court); *State ex rel. Illum. Co. v. Cuyahoga Cty. Court of Common Pleas*, 97 Ohio St.3d 69, 2002-Ohio-5312, 776 N.E.2d 92, ¶ 21 (same). Moreover, in *Allstate Ins. Co. v. Cleveland Elec. Illum. Co.*, 119 Ohio St.3d 301, 2008-Ohio-3917, 893 N.E.2d 824, ¶ 8, we rejected the notion that alleging a common-law tort is sufficient, by itself, to confer jurisdiction upon the common pleas court.

{¶ 27} In sum, jurisdiction is not conferred in cases involving public utilities based solely on the form of action. *Allstate* at ¶ 8; *State ex rel. Columbia Gas of Ohio, Inc. v. Henson*, 102 Ohio St.3d 349, 2004-Ohio-3208, 810 N.E.2d 953, ¶ 19. Instead, courts must look to the substance of the allegations in the complaint to determine the proper jurisdiction. *State ex rel. Illum. Co. v. Cuyahoga Cty. Court of Common Pleas*, 97 Ohio St.3d 69, ¶ 21, citing *Kazmaier*, 61 Ohio St.3d at 154, 573 N.E.2d 655. *See, e.g., Allstate* at ¶ 14; *Henson* at ¶ 20. We therefore find that the court of appeals erred when it held that pursuant to *Milligan*, the common pleas court has subject-matter jurisdiction over the fraud claim.

**The *Allstate* test**

{¶ 28} The court of appeals also held that the common pleas court had jurisdiction over the fraud claim pursuant to *Allstate Ins. Co. v. Cleveland Elec. Illum. Co.*, 119 Ohio St.3d 301, 2008-Ohio-3917, 893 N.E.2d 824. In *Allstate*, we adopted a two-part test to determine whether the common pleas court or the PUCO has jurisdiction over a tort action against a public utility. Under this test, we ask (1) whether the PUCO's administrative expertise is required to resolve the issue in dispute and (2) whether the act complained of constitutes a practice normally authorized by the utility. If the answer to either question is "No," the claim is not within the PUCO's exclusive jurisdiction. *Id*. at ¶ 11-13.

### The court of appeals erred in applying the *Allstate* test

{¶ 29} FirstEnergy contends that the court of appeals erred in applying the *Allstate* test. We agree.

### Is the commission's expertise necessary to resolve the issue?

{¶ 30} The court of appeals determined that the PUCO's expertise was not necessary to resolve the fraud claim. The court, however, did not explain how it reached that conclusion. 2011-Ohio-5434, 969 N.E.2d 1241, at ¶ 58. This was error because many of the same determinations that the court of appeals said would be necessary to resolve the contract claims—which the court of appeals determined did require PUCO expertise to resolve—would be equally necessary to resolve the fraud claim.

{¶ 31} Before discussing the fraud claim, the court of appeals determined that the PUCO's expertise was required to resolve the contract claim because

> decisions would have to be made concerning: (1) whether [the customers] were promised rates that were in violation of the PUCO-approved tariffs or were not authorized by the PUCO; and (2) the amount of the rate overcharge, if any, based on an analysis of the difference between the charges imposed using the former discounted rates and the amounts charged based on the rates, discounts, and credits subsequently imposed after the discount program was eliminated.

2011-Ohio-5434, 969 N.E.2d 1241, ¶ 58.

{¶ 32} In their fraud claim, the customers allege that the companies (1) deceptively induced them to purchase all-electric homes and appliances by promising them a discounted rate as long as they used electricity as their sole source of energy and (2) eliminated the discounted rate in May 2009 and are

charging them a higher rate, even though customers continue to maintain their all-electric status. To prevail, the customers would have to prove, among other things, that the companies guaranteed them a specific discounted rate and that since May 2009, the companies have charged them more than the promised rate. To determine whether the customers are being overcharged will require comparing the discounted rate to the rate charged after May 2009. Such comparisons will in turn require a review of the companies' various residential rate schedules and customer billing records. And given the PUCO's authority to set rates and approve tariff schedules, any review will also require analysis of various orders entered by the commission. *See generally* R.C. 4905.22, 4905.30, and 4905.32.

{¶ 33} Such a review could prove particularly difficult in this case. According to the customers' complaint, the companies' fraudulent conduct allegedly lasted nearly 40 years and involved over 60 named plaintiffs. And before the commission consolidated the companies' residential rate schedules into one schedule in 2009, CEI had 12 residential rate schedules and Ohio Edison had 7. *See In re FirstEnergy*, Pub. Util. Comm. No. 07-551-EL-AIR, at 23, fn. 1 (Jan. 21, 2009). Another complicating factor is that the discount rate charged to all-electric customers was not a fixed charge. Under the companies' rate design for all-electric customers, the rate charged to customers varied depending on the amount of electricity the customer used. *See* Pub. Util. Comm. No. 10-176-EL-ATA, at 2 (May 25, 2011) (describing the declining block rate structure). Thus, any comparison of the discount rate and the postdiscount rate would require a review of charges that varied from month to month based on the amount of electricity a customer used. In addition, beginning in 2009, the commission issued a series of orders that approved rate credits (Riders RDC, EDR, and RGC) for all-electric customers that were designed to mitigate the elimination of the rate discounts. *See* Pub. Util. Comm. No. 07-551-EL-AIR, at 23–24 (Jan. 21, 2009);

No. 08-935-EL-SSO, at 9–10 (Mar. 25, 2009); No. 10-388-EL-SSO (Aug. 25, 2010); and No. 10-176-EL-ATA, at 8, 20 (May 25, 2011). Consideration of these credits would be necessary to decide whether the customers are being overcharged, as they allege, and if so, by how much.

**{¶ 34}** In *Kazmaier*, this court held that the commission's expertise was required to determine the existence and amount of a rate overcharge, which "would require an analysis of the rate structure and various charges that were in effect under each of the tariff schedules during the period." 61 Ohio St.3d at 153, 573 N.E.2d 655. Likewise, the customers' fraud claim requires a determination whether the companies are overcharging all-electric customers by eliminating the discounted rate. Thus, resolution of the fraud claim in this case requires the same kind of analysis that *Kazmaier* stated was best accomplished by the PUCO. In short, the commission is the fact-finder best suited to review and analyze various charged rates, rate designs, tariff schedules, and commission orders. We therefore conclude that the commission's expertise is required to resolve the fraud claim.

### Does the act complained of constitute a practice normally authorized by the utility?

**{¶ 35}** As to the second part of the *Allstate* test, the court of appeals determined that with respect to the fraud claim, the act complained of did not constitute a practice normally authorized by the utility. The court of appeals, however, failed to clearly identify the act of the companies that the customers were complaining of. Nor did the appellate court clearly articulate why that act was not a practice normally engaged in by the companies. 2011-Ohio-5434, 969 N.E.2d 1241, ¶ 58.

**{¶ 36}** After review of the customers' complaint, we find that the act complained of here was the companies' offer to charge a discount rate to customers who used electricity as their main source of energy. Offering special or discounted tariff rates to certain customers is a practice normally engaged in by

the utility. In fact, the practice is specifically authorized by statute. R.C. 4905.31, which allows for "reasonable arrangement[s]" between utilities and customers, permits a public utility to classify its customers for rate-making purposes. R.C. 4905.31 also gives the commission the authority to approve rates tailored to govern a specific customer's service. *See In re Application of Ormet Primary Aluminum Corp.*, 129 Ohio St.3d 9, 2011-Ohio-2377, 949 N.E.2d 991, ¶ 1. Likewise, R.C. 4905.33 allows the charging of different or special rates unless the utility is performing "a like and contemporaneous service under substantially the same circumstances and conditions." And R.C. 4905.35 allows utilities to make or give preferences and advantages to customers, so long as they are not "undue or unreasonable." *See, e.g., Weiss v. Pub. Util. Comm.*, 90 Ohio St.3d 15, 734 N.E.2d 775 (2000) (rejecting the argument that the utility's program—which charged discount rates only to certain customers located within the utility's service territory—violated R.C. 4905.33 and 4905.35).

{¶ 37} In sum, the statutes and case law do not require absolute uniformity in rates and prices; they allow utilities to charge different and unequal rates so long as there is some actual and measurable difference in the furnishing of services. *See Mahoning Cty. Twps. v. Pub. Util. Comm.*, 58 Ohio St.2d 40, 43-44, 388 N.E.2d 739 (1979). Thus, because the offering of special or discount rates is a practice normally engaged in by public utilities and authorized by the commission, it follows that the commission is best suited to adjudicate any claims regarding the reasonableness and lawfulness of the companies' offer.

### CONCLUSION

{¶ 38} Based on the foregoing, we find that the customers' fraud claim is not a pure tort action. The fraud claim is, in essence, a claim that the companies are overcharging the customers for electric service. No matter how their claim is labeled, the customers are challenging the propriety of the rates that the companies are charging for all-electric service. Complaints challenging the rates

charged for utility service fall within the exclusive jurisdiction of the PUCO. R.C. 4905.26.

{¶ 39} Therefore, we reverse the judgment of the court of appeals and reinstate the order of the trial court dismissing the fraud claim.

Judgment reversed.

O'CONNOR, C.J., and LUNDBERG STRATTON, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., dissents and would affirm the judgment of the court of appeals.

_____

Jones Day, David A. Kutik, Jeffrey Saks, and Chad Readler, for appellants, FirstEnergy Corporation, the Cleveland Electric Illuminating Company, and Ohio Edison Company.

Michael E. Gilb and James E. Grendell, for appellees.

_____